**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EDWARD ARNOLD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | |
| AUTOZONE, INC., et al., | : | |
| | : | NO. 13-1329 |
| Defendants. | : | |

**MEMORANDUM**

**STENGEL, J.**                                                    **March 2, 2016**

      Plaintiff Edward Arnold brought this employment discrimination action against

his former employer and coworkers, AutoZone, Inc., AutoZoners Inc., AutoZoners, LLC,

Donald Davis, Cody Broaddus and Richard Greaves.[1]  The defendants, AutoZone, Cody

Broaddus and Richard Greaves, collectively filed a motion for summary judgment.

Defendant Donald Davis also filed a motion for summary judgment.  In his amended

complaint, Mr. Arnold alleges that his former employer, AutoZone, unlawfully

discriminated and retaliated against him in violation of Title VII of the Civil Rights Act

of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the

Americans with Disabilities Act ("ADA"), and the Pennsylvania Human Relations Act

("PHRA").   Mr. Arnold's amended complaint also includes a claim for wrongful

discharge and defamation.  This matter has been fully briefed and following oral

---

[1] Hereinafter, AutoZone, Inc., AutoZoners Inc., and AutoZoners, LLC will collectively be referred to as
"AutoZone."

arguments, I find that there is no genuine issue of material fact and defendants are entitled to judgment as a matter of law.  Accordingly, I grant AutoZone, Richard Greaves and Cody Broaddus' motion for summary judgment and Donald Davis' motion for summary judgment.

## I.     BACKGROUND[2]

### A.  The Hiring of Mr. Arnold as a MIT

Mr. Arnold was born on October 14, 1967, making him forty-two years old at the time of his hire and forty-four years old at the time of his termination.  (Doc. No. 8[3] ¶ 16).   On January 27, 2010, Mr. Arnold applied for a retail store management position with AutoZone and on March 6, 2010, AutoZone hired Mr. Arnold as a manager-in-training ("MIT") at AutoZone's Thorndale, Pennsylvania location.  (Doc. No. 65, Ex. 2[4] ¶ ¶  1,4).  The Defendant, Donald Davis, was hired as a MIT in February 2011 after Mr. Arnold and was promoted to store manager in July 2011.  (Id. at ¶ 47).

At the time of his hire, AutoZone provided Mr. Arnold with their Store Handbook and Code of Conduct ("Handbook") which informed Mr. Arnold about AutoZone's policies and procedures including the procedure for reporting discrimination and harassment.  (Doc. No. 66, Att. 3[5] ¶ 14).  The Handbook includes AutoZone's equal employment opportunity, anti-discrimination, and anti-retaliation policies, and sets forth the procedures for reporting discrimination and harassment.  (Doc. No. 65, Att. 2 ¶ ¶ 14-

---

[2] The facts are set forth in the light most favorable to the non-moving party.
[3] Plaintiff's Amended Complaint.
[4] Plaintiff's Counter-Statement of Undisputed/Disputed Material Facts to AutoZone Defendants.
[5] Plaintiff's Counter-Statement of Undisputed/Disputed Material Facts to Defendant Donald Davis, Jr.

15).   Mr. Arnold acknowledged that he read and understood AutoZone's policies set forth in the Handbook.  (Id. at ¶ 13).

The MIT position that Mr. Arnold and Defendant Davis were hired for is a position within AutoZone's Management Certified program.  (Id. at ¶ 40).  AutoZone's Management Certified program is training program in which the employees complete various teaching modules in order to learn the standard operating procedures of the store. (Id. at ¶ 43).  While AutoZone estimates that the program typically takes around eight (8) weeks to complete, completion of the program may take longer depending on the employee's progress and individual circumstances.  (Doc. No. 61, Ex. J[6], 11).  Once an employee completes the Management Certified program, the district and regional manager will make a decision to either:  (1) immediately promote the MIT into an open store manager position if one is available; (2) re-assign the MIT to a parts and service manager ("PSM") position at the same rate of pay pending a store manager position opening; (3) re-assign the MIT to PSM position with pay reduction (due to capability or performance); or (4) terminate the MIT's employment based on their capability or performance.  (Id.).  Mr. Arnold recognized that there was no guarantee that a MIT would be given a position of store manager upon completion of the program.  (Doc. No. 61, Ex. A[7], 109:6-8).

Mr. Arnold held the position of MIT from March 2010 until July 2010 at which time he had to take a leave of absence in order to have open heart surgery.  (Doc. No. 65,

---

[6] Defendants' Answers and Objections to Plaintiff's First Set of Interrogatories.
[7] Excerpts from the Deposition of Edward Arnold.

Att. 2 ¶ 18).  Following Mr. Arnold's leave of absence, in January 2011, Mr. Arnold resumed his position as MIT at the same hourly rate as he held before his leave.  (Id. at ¶ 25).  However, Mr. Arnold was reassigned from AutoZone's Thorndale location to the Kennett Square location, Store #2995, and now reported to Store Manager C. K.[8]  (Id. at ¶ 23).  From January 2011 until March 2011, Mr. Arnold remained a MIT at the Kennett Square location.  (Id. at ¶ 48).

In March 2011, Mr. Arnold completed AutoZone's Management Certified program and on March 13, 2011, Mr. Arnold became an assistant store manager of the Kennett Square location.  (Doc. No. 61, Ex. L[9] ¶ 6).  According to AutoZone, AutoZone acted in accordance with their policy governing the Management Certified program by placing Mr. Arnold in an assistant store manager position since there were no available store manager positions.  (Doc. No. 61, Att. 20[10] ¶ 51).  Even if there had been an open store manager position, AutoZone's District Manager stated that would not have given the position to Mr. Arnold at that time because he felt that Mr. Arnold needed more training.  (Id. at ¶ 50); (Doc. No. 61, Ex. C[11], 86:12-18).   Mr. Arnold contends that he was falsely accused of poor performance and because of these accusations, he was demoted to assistant manager.  (Doc. No. 66, Att. 3 ¶ 30).

---

[8] In March 2011, Mr. Arnold reported to the Human Resources Manager, defendant Richard Greaves, that Store Manager C.K. was stealing money and time from AutoZone.  (Doc. No. 66, Att. 3 ¶ 29).  After a thorough investigation of Mr. Arnold's allegations, AutoZone concluded that the Mr. Arnold's allegations were correct and terminated Store Manager C.K..  Id. at ¶ 29.

[9] Declaration of Richard Greaves.

[10] AutoZone's Statement of Undisputed Material Facts.

[11] Excerpts from the Deposition of Richard Greaves.

4

In March 2011, Mr. Arnold was transferred back to AutoZone's Thorndale location where he was under the management of Store Manager J. W. (Doc. No. 66, Att. 3 ¶ 31). According to Defendant Greaves, the Human Resources Manager, Mr. Arnold was transferred to Thorndale because it was deemed to be closer to his home and because there were no open store manager positions in the area. (Doc. No. 65, Att. 2 ¶ 48). In October 2011, Mr. Arnold reported to Defendant Greaves that Store Manager J.W. was treating him poorly and that he suspected that Store Manager J.W. was stealing from AutoZone. (Id. at ¶ 59). After an investigation by the Regional Loss Prevention Manager, Mr. Doug Haley, Store Manager J.W. was terminated on November 3, 2011. (Id. at ¶ 61).

Store Manager J.W.'s termination left a store manager position in the Thorndale location open. (Id. at ¶ 51). Rather than giving Mr. Arnold the store manager position, AutoZone transferred Defendant Davis to the Thorndale location to replace Store Manager J.W. (Id. at ¶ 62). AutoZone states that the Thorndale store manager position was given to Defendant Davis because Defendant Davis was already a store manager at another location and had requested to be transferred to a store closer to his home when a position became available. (Doc. No. 61, Att. 20 ¶ 62). Mr. Arnold disputes AutoZone's motives for giving Defendant Davis' the store manager position instead of him. (Id.) Mr. Arnold claims that the fact that Defendant Davis was younger than him and was hired as an MIT after him, but nonetheless was given Store Manager J.W.'s position evidences AutoZone's age discrimination against him. (Id.)

### B.  Mr. Arnold's Medical Conditions

Mr. Arnold suffers from Bartter's Syndrome which affects his kidney functioning and causes related complications to his heart and blood. [12]   (Doc. No. 65, Att. 2 ¶ 136). Due to his medical condition, Mr. Arnold took a leave of absence to have open heart surgery in July 2010, about four months after his hire at AutoZone.  (Id. at ¶ 18). Because Mr. Arnold had only been working at AutoZone for a short period of time, he was not entitled to leave under the Family and Medical Leave Act ("FMLA"); however, AutoZone permitted him to take leave and Mr. Arnold was provided with short-term disability benefits.  (Id. at ¶ 19).  Mr. Arnold was released to return to work from his leave of absence on January 3, 2011, and returned to work on January 10, 2011.  (Id. at ¶ 22).  When Mr. Arnold returned to work, he did not have any medical restrictions.  (Id. at ¶ 26).

However, Mr. Arnold testified that after his return in January 2011, he did require certain accommodations for his illness.  (Doc. No. 61, Ex. A, 214:6-14).  For one, Mr. Arnold required more leave time.  (Id. at 16-17).  Additionally, due to his Bartter's Syndrome, Mr. Arnold needed to eat frequently in order to maintain his potassium levels. (Doc. No. 66, Att. 3 ¶ 26).  Mr. Arnold alleges that Store Manager J.W. and Defendant Davis denied him meal breaks.  (Id. at ¶ 50).  Mr. Arnold testified that he did tell

---

[12] Bartter's Syndrome is an "inherited defect in the renal tubules that causes low potassium levels, low chloride levels, which in turn causes metabolic alkalosis."  The Bartter Site:  Information and Support for Bartter and Gitelman Syndromes, http://barttersite.org/bartters-syndrome/ (last visited Oct. 21, 2015).  Symptoms include fatigue, increased urination, increased thirst, waking up at night to urinate, generalized weakness, salt cravings, dehydration, mental confusion, vomiting, muscle weakness, muscle spasms, tetany, failure to thrive and short stature (if untreated).  Id.

Defendant Davis that he had a medical condition, but that he did not tell Defendant Davis that the reason he had to take lunch breaks was because of his medical condition.  (Doc. No. 60, Ex. D[13], 92: 14-22).  Rather, Mr. Arnold stated that "I believe a few of the times I told him right out that I just don't feel good and I'm pretty—I'm really, really sure that I told him I need to take my medicine."  (Id.)  When Mr. Arnold took his extended leave from July 2010 to January to have surgery related to his condition, he informed Defendant Greaves about his condition; however, the AutoZone Defendants contend that Defendant Broaddus and Mr. William Smith, AutoZone's Regional Manager, were not aware of Mr. Arnold's medical condition when Mr. Smith terminated him upon Defendant Greaves and Ms. Penelope Bertolotti's recommendation.[14]  (Doc. No. 61, Att. 20 ¶¶ 137-38).

### C.  Attendance Issues

Mr. Arnold also has a daughter that requires medical care and Mr. Arnold claims that the Defendants' repeated denials of his requests for leave in order to care for his daughter's medical condition under FMLA constituted disability discrimination.  (Doc. No. 65, Att. 2 ¶ 140).  From January 24, 2012 to January 26, 2012, Mr. Arnold was absent from work because he had to get a root canal and because his daughter was hospitalized.  (Doc. No. 66, Att. 3 ¶ 42).  AutoZone states that Mr. Arnold advised Defendant Davis of his absence by text message in violation of AutoZone attendance policy.  (Doc. No. 61, Att. 20 ¶ 41).  AutoZone claims that the attendance policy in 2012

---

[13] Deposition of Edward Arnold.
[14] Ms. Penelope Bertolotti (formerly "Penelope Quimby") is AutoZone's Regional Human Resources Manager.

required employees to call management at least an hour before their scheduled start time if they were going to be late and prohibited text messages as a permitted form of notification.  (Doc. No. 60, Ex. D, Arnold0018).  Mr. Arnold claimed that the Handbook given to him when he was hired stated that text messaging was a sufficient form to communicate an absence and that he was not provided an updated Handbook.  (Doc. No. 61, Ex. A, 120:2-6).  Mr. Arnold was not aware of the updated policy until Defendant Davis showed him.  (Doc. No. 66 Att. 3 ¶ 19).  Mr. Arnold disputes that he only texted Defendant Davis to inform Defendant Davis of his January 2012 absences stating that he also called Defendant Davis to tell Defendant Davis that, "[he] was ill."  (Doc. No. 61, Ex. A, 136:13-19).

According to Mr. Arnold, Mr. Arnold requested FMLA leave for his January 2012 absences to care for his daughter, but was denied them despite the fact that he met the requirements under the FMLA.  (Doc. No. 65, Att. 2 ¶ 48).  In response to this, Defendant Greaves testified that he did not "recall Arnold making any specific request for leave of absence relating to his daughter's illness" and therefore, "[he] did not get into that conversation with him.  [He] assumed that was something that would be done through the benefits department."  (Doc. No. 61, Ex. C, 94:11-13); (Doc. Nos. 65, 66, Ex. C, 48: 2-9).  After Mr. Arnold took his absence in January 2012, Defendant Davis issued Mr. Arnold attendance points for his absence.  (Doc. No. 66, Att. 3 ¶ 43).  Mr. Arnold brought in a doctor's note for the absences and Defendant Greaves then removed the points that Defendant Davis had issued.  (Doc. No. 65, Att. 2 ¶ 142).  Mr. Arnold

admitted that Defendant Davis did not issue him any discipline for attendance or performance in connection with the attendance points he received which were later removed.  (Id. ¶ 144).  When asked whether his termination from AutoZone was in connection with any absences or points, Mr. Arnold testifies that it was not.  (Doc. No. 67[15], Ex E, 71:9-11).

### D.  Mr. Arnold Reports Defendant Davis and Mr. B.M. for Sexual Harassment

On February 18, 2012, Mr. Arnold reported to Defendant Greaves that Defendant Davis and Mr. B.M., another AutoZone employee, made sexually offensive comments about a prospective female hire and that Defendant Davis had even photographed the prospective female hire on his cell phone without her knowledge or consent.  (Doc. No. 66, Att. 2 ¶ 64); (Doc. No. 66, Att. 1, 9).  Mr. Arnold testified that Ms. D.H. came in to the Thorndale store in order to interview for a position with AutoZone.  Id.  After Mr. Arnold sat in on the interview between Ms. D.H. and Defendant Davis, Mr. Arnold told Defendant Davis that he did not believe Ms. D.H. to be a good candidate for the job. (Doc. No. 67, Ex. E, 175:18-20).  In his deposition, Mr. Arnold described the subsequent conversation between himself and Defendant Davis as follows:

> Q.  Were you offended by the comment that you say Don made about her having nice cleavage?
>
> A. Absolutely
>
> Q. And a great morale booster, did you think he meant something inappropriate by that?
>
> A. By his actions while he was saying that, yes.

---

[15] Exhibits in Support of Plaintiff's Responses in Opposition.

Q. What were his actions?

A.  He was saying it with the motion, of like he was having sex.

…

A.  And he stated that she was coming in as a red shirt, but she would work her
way up.

Q. Did you think he meant something inappropriate by that?

A. By his actions.

Q. What kind of actions?

A.  The same thing.

Q. By, against making motions as if he were having sex?

A. Yes.

(Doc. No. 67, Ex. E, 176:10-21).  After the exchange between Defendant Davis and Mr.

Arnold regarding Ms. D.H., Mr. Arnold called Defendant Greaves to report Defendant

Davis for sexual harassment because, "[he] was trying to do [his] job and report

something that [he] knew" not because he was trying to get Defendant Davis fired in

connection with these comments.  (Doc. No. 67, Ex. E, 194:23-24).  Defendant Greaves

conducted an investigation of the incident, but ultimately did not take any remedial

action.  (Doc. No. 65, Att. 2 ¶ 65).  After the incident, Mr. Davis went to other associates

in the store stating that Mr. Arnold did not agree with the hiring of Ms. D.H.  (Doc. No.

67, Ex. E, 196:21-25); (Id. at 197:1-22).

While Defendant Broaddus testified that he never informed Defendant Davis that

it was Mr. Arnold that made the complaint against him, Mr. Arnold contends that

Defendant Davis must have known that it was Mr. Arnold who made the complaint

against him since the only managers that participated in Ms. D.H.'s interview were

Defendant Davis, Mr. B.M. and Mr. Arnold.  (Doc. No. 65, Att. 2 ¶ 70).  Since Mr. B.M. was also subject to the sexual harassment investigation, by process of elimination, Defendant Davis knew that it was Mr. Arnold who reported him.  (Id.)

### E.  The Core Exchange

When Mr. Arnold began his employment at AutoZone, he was given a unique identification number, CSR-22, and created a personal password linked to that identification number.  (Doc. No. 66, Att. 3 ¶¶ 8-9).  An AutoZone employee's CSR number can be used in AutoZone's computer system only if an employee first enters the password for the CSR number.  (Id. at ¶ 10).  Once an employee has logged into AutoZone's computer system with their password, any transaction that an employee makes including a core return can be tracked through their identification number.  (Doc. No. 65, Att. 2 ¶ 11).  This makes the use of the CSR numbers and confidential passwords particularly important for the purposes of loss prevention as AutoZone can target specific employees for investigation regarding any suspicious transactions.  (Doc. No. 61, Att. 20 ¶¶ 36-37).  AutoZone required employees to reset their passwords every 90 days, and an employee could reset his password at any time if he thought it had been compromised. (Id. at ¶ 32).  AutoZone expects employees to keep their password confidential, and Mr. Arnold testified that he understood that expectation and did not share his password with anyone.  (Id. at ¶ 30).  In fact, Mr. Arnold stated that he kept his password "150 percent confidential" and Mr. T.M., Mr. Arnold's co-worker, also testified that Mr. Arnold

"guarded his password pretty seriously."  (Doc. No. 67, Ex. D, 122:20-123:6); (Doc. No. 67, Ex. F, 35: 17-18).

On February 28, 2012, Mr. Arnold's CSR number, CSR-22, and confidential password were used to process a core exchange and to verify that an old core was present in the store following the transaction.  (Doc. No. 65, Ex. A, P-8).  The customer came into the store to purchase a new core, but did not bring in the old core to exchange.  (Id.) Despite the fact that the customer did not bring in the old core to exchange, the customer was still given the core exchange deposit of $46.00.  (Id.)  To give a customer the core exchange deposit of $46.00 without the exchange of the old core is a violation of AutoZone policy.  (Doc. No. 65, Ex. A, 174:1-7).  Mr. Arnold admits that on the Parts Counter Invoice Report and Duplicate Receipt his password was used to conduct and verify the transaction, and that this alone, would provide reasonable cause for the Loss Prevention Manager, Mr. Haley, to conduct an investigation of him.  (Doc. No. 65, Ex. A, 127:5-13); (Id. at 131:13-18).

According to Defendant Davis, this core exchange transaction came to light when the customer who had been given the core exchange deposit returned to the store with the old core seeking to get his $46.00 core exchange deposit back.  (Doc. No. 66, Att. 3 ¶ 73).  Once Defendant Davis realized that the customer had been given the core exchange deposit without the core actually being present, Defendant Davis contacted Defendant Broaddus, the District Manager, "because a customer was upset."  (Id.)  Then, Defendant Broaddus testified that he called Defendant Davis and instructed him to go through the

core return bin in order to confirm that the core was not present.  (Doc. No. 61, Att. 20 ¶ 79).  Defendant Davis confirmed to Defendant Broaddus that the core was not present in the bin.  (Id. at ¶ 82).  Mr. Arnold disputes that the part was not in the core bin as the customer had since returned the missing core.  (Doc. No. 65, Att. 2 ¶ 82).

On March 8, 2012, Mr. Haley questioned Mr. Arnold regarding the core transaction with Defendant Broaddus who acted as a witness.  (Id. at ¶ 87).  When Mr. Haley asked Mr. Arnold whether he processed the core exchange transaction, Mr. Arnold answered, "not that I recall," and when asked whether the core was present when he processed the core exchange refund Mr. Arnold answered, "I don't remember the transaction."  (Doc. No. 65, Ex. H, Haley-7).  Additionally, Mr. Haley asked Mr. Arnold why he violated company policy by creating this fraudulent core refund and Mr. Arnold responded by saying, "I didn't to the best of my knowledge nor would I ever do anything to blemish my integrity."  (Id.)  Finally, Mr. Haley asked Mr. Arnold whether he was aware that this was the improper way to process a core refund and Mr. Arnold answered, "Yes that's why I have never done that."  (Id.)  On the same day as Mr. Haley's investigation, Defendant Davis and Mr. B.M. submitted written statements regarding the return of the missing core by the customer.  (Doc. No. 65, Ex. H, Haley-7).

### F.  Mr. Arnold's Termination

Following Mr. Haley's investigation into the core exchange transaction, Ms. Penelope Bertolotti, Human Resources Manager, along with Defendant Greaves reviewed the statement that Mr. Haley had submitted to them from his questioning of Mr. Arnold

in addition to written statements of Mr. B.M. and Defendant Davis, and consulted with each other to make a recommendation on Mr. Arnold's employment status.  (Id. at ¶ 109). Ultimately, Defendant Greaves and Ms. Bertolotti recommended to Mr. William Smith, the Regional Manager, that Mr. Arnold be terminated for: (1) improper cash register procedures; (2) conduct detrimental to AutoZone, AutoZoners and AutoZone customers; and (3) loss of confidence.  (Doc. No. 67, Ex. N).  Mr. Smith testified that he read Mr. B.M. and Defendant Davis' written statements in addition to Mr. Haley's statement and decided that termination of Mr. Arnold was appropriate.  (Doc. No. 67, Ex. K, 43:18-21). During his deposition, Mr. Smith testified that when he decided to terminate Mr. Arnold he was not aware of Mr. Arnold's medical conditions, disability or requests for FMLA, and that he did not recall Ms. Bertolotti mentioning that Mr. Arnold had reported Donald Davis for sexual harassment.  (Id. at 53: 22-25; 54:1-25; 58:11-15); (Doc. No. 67, Ex. K); (Doc. No. 65, Att. 20 ¶ 114).

On March 13, 2012, Defendant Broaddus received an email from Ms. Bertolotti requesting that Defendant Broaddus terminate Mr. Arnold but to wait until Ms. Bertolotti resolved a separate complaint of Mr. Arnold.  (Doc. No. 65, Att. 2 ¶ 124).  On March 15, 2012, Defendant Broaddus asked Mr. Arnold to come meet with him at the store.  (Doc. No. 61, Ex. D, 131: 9-11).  Then Defendant Broaddus handed Mr. Arnold a Corrective Action Review Form ("CAR") and told Mr. Arnold, "you're no longer an employee of AutoZone."  (Id. at 151:15-16).  The CAR form lists as the reasons for Mr. Arnold's termination:  (1) improper cash register procedures; (2) conduct detrimental to AutoZone,

14

AutoZoners and AutoZone customers; and (3) loss of confidence.  (Doc. No. 61, Ex. A, P-6).  Mr. Arnold states that despite requests that Defendant Broaddus tell him the reasons for his termination, Defendant Broaddus simply kept repeating "you're no longer employed with AutoZone" and requested Mr. Arnold's badge and keys.  (Doc. No. 61, Ex. A, 152: 14-18).  The individual who replaced Mr. Arnold as Assistant Store Manager of the Thorndale location was a male employee who was born in 1959.  (Doc. No. 61, Ex. L ¶ 13).

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing relevant portions of the record, including depositions, documents, affidavits, or declarations, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse

party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c).

Summary judgment is therefore appropriate when the non-moving party fails to rebut the

moving party's argument that there is no genuine issue of fact by pointing to evidence

that is "sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the Court must draw "all

justifiable inferences" in favor of the non-moving party.  Anderson, 477 U.S. at 255.  The

Court must decide "not whether. . . .the evidence unmistakably favors one side or the

other but whether a fair-minded jury could return a verdict for the plaintiff on the

evidence presented."  Id. at 252.   In an employment discrimination case, the court must

ascertain "whether. . . there exists sufficient evidence to create a genuine issue of material

fact as to whether the employer intentionally discriminated against the plaint."  Hankins

v. Temple Univ. (Health Sciences Ctr.), 829 F.2d 437, 440 (3d Cir. 1987).  In the context

of employment discrimination claims, "conclusory allegations of discrimination, in the

absence of particulars, are insufficient to defeat summary judgment."  Taylor v. Cherry

Hill Bd. of Educ., 85 F. App'x 836, 839 (3d Cir. 2004).  Additionally, the plaintiff "may

not defeat a motion for summary judgment by the mere assertion, not documented by

record evidence, that the facts are sufficient to support his or her claims."  Lyles v. Phila.

Gas Works, No. 04-1561, 2005 WL 639729, * 1 (E.D. Pa. Mar. 18, 2005)(citing Sherrod

v. Phila. Gas Works, 209 F.Supp.2d 443, 448 (E.D. Pa. 2002)).

## III.    DISCUSSION

Mr. Arnold asserted claims under Title VII, the ADEA, the ADA and the PHRA against the defendants.  The court will "apply the same analytical framework to discrimination claims brought under the ADEA and PHRA as to those brought pursuant to Title VII."  White v. Planned Sec. Services, No. 10-2017, 2011 WL 6258307, *3 n.5 (E.D. Pa. Dec. 15, 2011)(citing Wishkin v. Potter, 476 F.3d 180, 185 (3d Cir. 2007)). Where, as here, the plaintiff lacks direct evidence of discrimination, Title VII, ADEA, ADA and PHRA discrimination claims are subject to the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Daniels v. Sch. Dist. of Phila., 982 F.Supp.2d 462, 479 (E.D. Pa. 2013)(holding that McDonnell Douglas provides the standard for claims under Title VII, the PHRA, and the ADEA); see also McCarty v. Marple Tp. Ambulance Corps, 869 F.Supp.2d 638, 645-46 (E.D. Pa. 2012)(stating that a plaintiff asserting an ADA claim proceeds using the burden-shifting framework set forth in McDonnell Douglas).  Under the McDonnell Douglas burden shifting framework, a plaintiff seeking to establish a *prima facie* case of discrimination must offer sufficient evidence that:  (1) he belongs to a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action despite being qualified; and (4) under circumstances that would raise an inference of discriminatory action, the employer continued to seek individuals with qualifications similar to the plaintiff's to fill the position.  Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003).

Once the plaintiff has established a *prima facie* case, the burden of production shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas, 411 U.S. at 802.  At this time, the employer must demonstrate "evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." Fuentes v. Perski, 32 F.3d 759, 763 (3d Cir. 1994).  If the employer is able to satisfy his burden of production, the presumption of discriminatory action raised by the *prima facie* case is rebutted and the burden shifts back to the plaintiff to establish that the employer's legitimate, non-discriminatory reason was merely pretext for discrimination.  McDonnell Douglas, 411 U.S. at 804.  At the summary judgment stage, the plaintiff can establish pretext by showing some evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reasons.  Joyce Milillo v. Thomas Jefferson U. Hospitals, Inc., No. 14-3143, 2015 WL 5964992, *5 (E.D. Pa. Oct. 13, 2015).

### A.   ADEA, TITLE VII, ADA, PHRA CLAIMS

#### 1.   ADEA Claim

Under the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  The PHRA provides:  "It shall be an unlawful discriminatory practice. . . [f]or any employer because of the . . .age. . . of any individual. . . to otherwise discriminate against such individual . . .with respect to compensation,

18

hire, tenure. . .if the individual is the best, able and most competent to perform the services requires."  43 Pa. Stat. Ann. § 955(a).  To prevail on a claim of age discrimination under the ADEA or the PHRA, "a plaintiff must show that his or her age 'actually motivated' or 'had a determinative influence on' the employer's adverse employment decision."  Fasold v. Justice, 409 F.3d 178, 184 (3d Cir. 2005).  In order to demonstrate a *prima facie* case of age discrimination, Mr. Arnold must show that:  (1) he is forty years of age or older; (2) AutoZone took an adverse employment action against him; (3) he was qualified for the position at issue; and (4) he was replaced by an "employee who was sufficiently younger to support an inference of discriminatory animus."  Smith v. City of Allentown, 589 F.3d 684, 689 (3d Cir. 2009).

In the case at hand, Mr. Arnold alleges three adverse employment actions that he suffered on account of his age.  First, Mr. Arnold claims that he was "subjected to age related derogatory comments and shunned because of his age."  (Doc. No. 65, Att. 1, 16).  Second, Mr. Arnold alleges age discrimination based on the fact that the Store Manager position was given to the younger Defendant Davis after Mr. Arnold reported Store Manager J.W. for shrinkage and Store Manager J.W. was terminated.  Mr. Arnold claims that he was qualified for the position and because of his age, he was overlooked for promotion to the store manager position. Third, Mr. Arnold contends that he was terminated because of his age.

Mr. Arnold claims that he was discriminated against on the basis of age when he was subject to "age-related derogatory comments and shunned because of his age."  The

only "age-related derogatory comment" that Mr. Arnold cites to is a stray remark by a non-decisionmaker referring to Mr. Arnold as "old man." (Id. at 19). The law is well-settled that an adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998). I find that a stray remark by a non-decisionmaker does not constitute an adverse employment action for purposes of Title VII.

Mr. Arnold also claims that he was discriminated against on the basis of age when he was overlooked for the store manager position at the Thorndale Store after Store Manager J.W. was terminated. After Store Manager J.W. was terminated, AutoZone transferred the younger Defendant Davis from a New Jersey AutoZone rather than promoting Mr. Arnold, a qualified, experienced and knowledgeable individual, to the store manager position. The AutoZone Defendants state that Defendant Davis was transferred to fill Store Manager J.W.'s position because "Mr. Davis, who was already a Store Manager at another location, requested a transfer to a store closer to where he lived." (Doc. No. 61, Att. 2, 8)(citing id. at Ex. I, 54:25-55:5).

Assuming *arguendo* that Mr. Arnold was able to demonstrate a *prima facie* case of age discrimination based on the failure to promote him to store manager after Store Manager J.W.'s termination, Mr. Arnold has not produced any evidence that the defendants' legitimate non-discriminatory reason for giving J.W.'s store manager

position to Defendant Davis was pretext for age discrimination.  Defendant Davis had already been acting as a store manager in a different location and at his own request was transferred into Store Manager J.W.'s position.  Mr. Arnold does not contend or produce evidence showing that the decision to transfer Defendant Davis at his request was either a *post hoc* fabrication or pretext for a discriminatory animus.  Without evidence to suggest that Defendant Davis' transfer to Store Manager J.W.'s position was pretext for age discrimination, Mr. Arnold's claim that he was overlooked for the store manager position is simply a conclusory and speculative allegation, which is insufficient to survive a motion for summary judgment.

Finally, Mr. Arnold alleges age discrimination based on his termination. Importantly, the Third Circuit has recognized that "one of the elements of a *prima facie* case in an age discrimination action predicated on indirect evidence is that the person ultimately replacing the plaintiff be sufficiently younger than the plaintiff so that an inference of age discrimination can be drawn from the replacement."   Hyland v. American Intern. Group, 360 F.App'x 365, 367 (3d Cir. 2010)(citing Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001)).  Mr. Arnold has not produced evidence that his replacement was younger.  In fact, testimony from Defendant Greaves reveals that Mr. Arnold was replaced by a man older than him. (Doc. No. 61, Ex. L ¶ 13). The failure to demonstrate that a younger employee replaced him in conjunction with evidence that his replacement was older is determinative of Mr. Arnold's age discrimination claim.  Mr. Arnold has not met the fourth prong of demonstrating a *prima*

*facie* case under the ADEA and therefore, the defendants are entitled to summary judgment on the ADEA claim.

## 2.   Title VII Retaliation

Mr. Arnold alleges that he was terminated from employment in retaliation for reporting Defendant Davis to Human Resources for sexual harassment of a prospective female hire.  Title VII makes it unlawful for an employer to discriminate against any employee "because [the employee] has opposed any practice made an unlawful practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).   In order to establish a *prima facie* Title VII retaliation claim, an employee must prove that:  "(1) []he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against [him]; and (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action."  Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006)(citing Nelson v. Upsala Coll., 51 F.3d 383, 286 (3d Cir. 1995).  Under Title VII, a protected activity is an "instance where an employee has opposed a discriminatory employment practice based upon an individual's race, color, religion, sex, or national origin.  Gray v. Barney, No. 13-1055, 2016 WL 369360, *9 (Del. Jan. 29, 2016).  A *prima facie* claim of retaliation under Title VII and the PHRA, requires that the plaintiff prove that the desire to retaliate was the "but-for" cause for the adverse employment action.  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2522-28 (2013).

The defendants ague that Mr. Arnold is unable to demonstrate a *prima facie* case of retaliation under Title VII because Mr. Arnold has failed to establish a causal connection between his participation in a protected activity and his termination.  With respect to the causation component, the court must consider whether "a reasonable jury could link the employer's conduct to the retaliatory animus." Jensen v. Potter, 435 F.3d 444, 449 n.2 (3d Cir. 2006).  To assess this, the court may consider (1) the "'temporal proximity' between the plaintiff's protected activity and the employer's allegedly retaliatory response, and the 'existence of a pattern of antagonism in the intervening period.'" Gray, 2016 WL 369360 at *9 (citing Jensen, 435 F.3d at 450).

Mr. Arnold reported Defendant Davis to Defendant Greaves for sexual harassment on February 18, 2012.  (Doc. No. 65, Att. 1, 10).  Twenty-six days later, Mr. Arnold was terminated on March 15, 2015.  (Id. at 12).  To be considered " 'unusually suggestive' and dispositive of a causal connection, the temporal proximity between the participation in a protected activity and the adverse employment action "must be extremely close in time." Betz v. Temple Health Systems, No. 15-727, 2016 WL 147155, * 8 (E.D. Pa. Jan. 13, 2016)(citing Conlin v. Warrington Twp., No. 06-2245, 2009 WL 1227950, *3 (M.D. Pa. Apr. 30, 2009)).   In other words, the "temporal proximity must be measured in days, rather than in weeks or months, to suggest causation without corroborative evidence." Where the temporal proximity is not "unusually suggestive," the plaintiff is required to present further evidence to substantiate the causal connection between the participation in a protected activity and the adverse employment action. Betz, 2016 WL 147155, at *8

(citing <u>McCloud v. United Parcel Serv., Inc.</u>, 543 F.Supp.2d 391, 401-2 (E.D. Pa. 2008)). The Third Circuit has advised that "although timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference." <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 280-81 (3d Cir. 2000).

In Mr. Arnold's case, the twenty-six day period between reporting the sexual harassment and his termination is not "unusually suggestive" of a causal connection between the two events. Therefore, Mr. Arnold can only meet the third prong of *prima facie* case if he has some corroborative evidence to establish causation. Despite Mr. Arnold's claims that "the hostility at Thorndale AutoZone was out of control and affected Plaintiff's health and well-being," Mr. Arnold does not present any specific evidence suggesting a retaliatory animus and there is no indication from the record that Mr. Arnold faced a "pattern of antagonism" from the time he reported the sexual harassment to his termination. The lack of evidence regarding temporal proximity or a pattern of antagonism is not in itself fatal to Mr. Arnold's retaliation claim; however, what is fatal is that Mr. Arnold has produced no evidence whatsoever demonstrating a causal connection between his participation in a protected activity and his termination. Without evidencing a causal connection between his reporting of the sexual harassment and his termination, Mr. Arnold cannot meet the requirements for demonstrating a *prima facie* claim of retaliation and the defendants are entitled to judgment as a matter of law.

3. **ADA Claim**

Mr. Arnold brings a disability discrimination claim under the ADA against the AutoZone Defendants.  Mr. Arnold alleges that he was discriminated against and ultimately terminated because of his disability and his daughter's disability.  (Doc. No. 8 ¶ 43).  The ADA prohibits an employer "from discriminat[ing] against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  In order for Mr. Arnold to prevail on his claim of disability discrimination under the ADA, Mr. Arnold must present sufficient evidence to demonstrate that:  (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and  (3) he has suffered an adverse employment action because of that disability.  Mercer v. Southeastern Pennsylvania Transit Authority, 26 F.Supp.3d 432, 440 (E.D. Pa. 2014).  The ADA defines discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business."  42 U.S.C. § 12112(b)(5)(A).

Even if Mr. Arnold succeeded in evidencing a *prima facie* case of disability discrimination, the defendants have met their burden of demonstrating a legitimate non-discriminatory reason for terminating Mr. Arnold.  On February 28, 2012, the plaintiff's CSR number, CSR-22, and confidential password were used to process an improper core

exchange.  (Doc. No. 65, Ex. A, P-8).  Mr. Arnold stated that he kept his password "150 percent confidential."  (Doc. No. 67, Ex. D, 122:20-123:6).  When asked about the improper core transaction as part of Mr. Haley's March 8, 2012 investigation, Mr. Arnold did not deny that he processed the improper core exchanged but stated that he could not recall the transaction.  (Doc. No. 65, Ex. H, Haley-7).  On the CAR form given to Mr. Arnold at his termination meeting on March 15, 2012, the reasons for Mr. Arnold's termination were listed as ""[i]mproper cash register procedures, conduct detrimental to Autozone, Autozoners and Autozone customers, loss of confidence."  There is nothing apparent on the CAR form to suggest that Mr. Arnold was terminated because of his or his daughter's disability, his request for FMLA leave time or absence points related to his or his daughter's disability.  Under McDonnell Douglas, Mr. Arnold must be able to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Olson v. General Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996)(citing Fuentes v. Perski, 32 F.3d 759, 764 (3d Cir. 1994)).  In other words, Mr. Arnold must show "not merely that the employer's proffered reason was so wrong, but that is was so plainly wrong that it cannot have been the employer's real reason."  Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997).

The defendants contend that Mr. Arnold cannot meet his burden for demonstrating pretext because he has provided no evidence indicating that Mr. Smith, the decision-

maker in Mr. Arnold's termination, even had knowledge of Mr. Arnold or his daughter's

disability.   See Glass v. Armstrong Utilities, No. 13-1173, 2014 WL 7015966, * 7 (W.D.

Pa. Dec. 11, 2014)("It is axiomatic that an adverse employment decision cannot have

been based on discriminatory animus if the decision-maker had no knowledge of the

alleged disability."); Straining v. AT&T Wireless Services, Inc., 144 F.App'x 229, 232

(3d Cir. 2005)(noting that the plaintiff must demonstrate that the employer knew of the

disability).  When asked to testify as to his knowledge of Mr. Arnold's disability, Mr.

Smith, the decision-maker in Mr. Arnold's termination, states as follows:

> Q    At any time, were you aware of Mr. Arnold requesting
>      Family Medical Leave Act?
>
> A    No.
>
> Q    At any time, were you aware of Mr. Arnold's
>      disabilities that he presented to the company?
>
> A    No.
>
> . . .
>
> Q    Are you aware that Mr. Arnold is disabled?
>
> A    No
>
> . . .
>
> Q    Were you ever placed on notice or notified . . .that Mr.
>      Arnold had a daughter that required medical attention?
>
> A    No.
>
> Q    Suffice to say, Mr. Greaves did not discuss any Family
>      Medical Leave regarding Mr. Arnold with you?
>
> A    No.
>
> Q    And Mr. Greaves did not discuss any Americans with
>      Disabilities Act protections for Mr. Arnold?  He did
>      not discuss that with you?
>
> A    No.

> Q     And is it fair to say Mr. Greaves did not notify you of
>        any disabilities for Mr. Arnold?
>
> . . .
>
> A     No, not to my knowledge.
>
> Q     Am I correct that Mr. Greaves did not notify you that,
>        at any time, Mr. Arnold was hospitalized?
>
> A     No.
>
> Q     Did Mr. Greaves ever discuss with you that Mr.
>        Arnold needed time off to take care for his daughter?
>
> A     Not to my knowledge.

(Doc. No. 67, Ex. K, 53:22-25; 54:1-25; 55:1-15).  From his testimony, Mr. Smith does

not even appear to have knowledge of Mr. Arnold's disability much less an "invidiously

discriminatory" motive for terminating Mr. Arnold on the basis of his disability.

Mr. Arnold contends that Mr. Smith "had prior knowledge of Plaintiff's

complaints to Human Resources that bolster Plaintiff's claims that termination was

retaliatory and pretext."[16]  (Doc. No. 79[17], 16).  Mr. Arnold cites to his own affidavit to

document that on March 13, 2012,  "Regional Manager William Smith contacted me by

---

[16] Along the same line of argument, Mr. Arnold also contends that Ms. Bertolotti had "prior knowledge of Plaintiff's complaints reported to Human Resources" prior to his termination and acted upon that knowledge in retaliation by terminating Mr. Arnold. (Doc. No. 79, 15). First, Ms. Bertolotti is not the decisionmaker.  Although the plaintiff might contend that Ms. Bertolotti made the recommendation to Mr. Smith to terminate Mr. Arnold following the core exchange investigation and thus, had some say in Mr. Arnold's termination, Mr. Smith is ultimately the decisionmaker who had the authority to terminate Mr. Arnold's employment based on Ms. Bertolotti's recommendation.  Second, even if Ms. Bertolotti could be considered a decisionmaker in Mr. Arnold's termination, Mr. Arnold has failed to demonstrate that Ms. Bertolotti was aware of his disability.  For purposes of establishing pretext, Mr. Arnold claims that Ms. Bertolotti had "prior knowledge of Plaintiff's complaint reported to Human Resources," and on March 14, 2012, Ms. Bertolotti "contacted [Mr. Arnold] by telephone to follow-up my complaints that I had reported yesterday to Regional Manager William Smith."  (Doc. No. 66, Ex. A ¶ 28).  For the same reasons that the affidavit is not sufficient to demonstrate that Mr. Smith had knowledge of Mr. Arnold's disability, the affidavit fails to establish that Ms. Bertolotti had knowledge of Mr. Arnold's disability.  The affidavit is even less persuasive in the context of Ms. Bertolotti as Mr. Arnold states that during the March 14, 2012 telephone call, Ms. Bertolotti spoke with Mr. Arnold about "the investigation regarding sexual harassment in the store."  (Doc. No. 79, 15)(citing Doc. No. 79, Ex. BBB, 159:23-160:24).

[17] Plaintiff's Sur-Reply in Support of Opposition To Summary Judgment Filed by AutoZone Defendants.

telephone and inquired of events at the Thorndale AutoZone that I had reported to Human Resources through Richard Greaves." (Doc. No. 65, Att. 5 ¶ 27). Specifically, Mr. Arnold states that during the March 13, 2012 telephone call with Mr. Smith, "Plaintiff detailed for Mr. Smith the issues in Thorndale including working in a hostile work environment directed at Plaintiff, the reported suspect sexual harassment, that Manager Maristch was in an intimate relationship with a subordinate, and attendance points given to Plaintiff although Plaintiff repeatedly requested entitled leave under FMLA as an accommodation for his disability and care of his daughter." (Doc. No. 65, Att. 2 ¶ 121). In support of the allegation that he discussed these issues with Mr. Smith, Mr. Arnold cites to his own affidavit. Mr. Arnold's affidavit states, "On March 13, 2012, then Regional Manager William Smith contacted me by telephone and inquired of events at the Thorndale AutoZone that I had reported to Human Resources through Richard Greaves." (Doc. No. 65, Att. 5, ¶ 27).

Mr. Arnold cannot meet his burden of demonstrating pretext based solely on his own self-serving affidavit. Blair v. Scott Specialty Gases, 283 F.3d 595, 608 (3d Cir. 2002)("[C]onclusory self-serving affidavits are insufficient to withstand a motion for summary judgment."). Moreover, even if Mr. Arnold's affidavit is reliable, Mr. Arnold's affidavit falls far short of what is need to make a sufficient pretextual demonstration. Mr. Arnold's affidavit broadly states that Mr. Smith and Mr. Arnold communicated by phone regarding "events at the Thorndale AutoZone that I had reported to Human Resources through Richard Greaves." (Doc. No. 65 Att. 5 ¶ 27). The affidavit does not provide any

further detail as to what "events" Mr. Arnold spoke with Mr. Smith about. Based on Mr. Arnold's affidavit, the March 14, 2012 telephone conversation between Mr. Arnold and Mr. Smith very well could have had nothing to do with Mr. Arnold's complaints regarding his disability. Although Mr. Arnold alleges in his Counter Statement of Facts that he spoke with Mr. Smith concerning his disability and his repeated requests for leave time, Mr. Arnold does not support these allegations with any further evidence on record.[18] Mr. Arnold cannot meet his burden of establishing pretext solely on the basis of a self-serving affidavit and a Counter Statement of Facts citing to his self-serving affidavit, both of which consist of conclusory and speculative allegations. I find that Mr. Arnold has failed to establish that the defendants' legitimate non-discriminatory reason for terminating Mr. Arnold was pretext on the basis of his disability. Accordingly, the defendants are entitled to summary judgment on Mr. Arnold's ADA claim.

### 4.     PHRA Claim Against Individual Defendants

Mr. Arnold alleges that individual defendants Donald Davis, Cody Broaddus and Richard Greaves aided and abetted discrimination in violation of the PHRA. Section 955(e) prohibits, "any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice." 43 Pa. Stat. Ann. § 955(e). "If the

---

[18] Mr. Arnold cites to a March 13, 2012 email between Ms. Bertolotti and Mr. Broaddus on which Mr. Smith is a recipient as corroboration of the claim that Mr. Smith had knowledge of Mr. Arnold's complaints, but once again, the statements made in the email are far too broad to prove any specific knowledge. The March 13, 2012 email from Ms. Bertolotti requests that Mr. Arnold's termination be delayed because she wanted to speak with him "regarding a complaint from him which [she] would like to resolve prior to." (Doc. No. 67, Pl.'s Ex. XX). There is nothing in this statement to show that Mr. Smith or even Ms. Bertolotti had knowledge of Mr. Arnold's complaints regarding his disability.

employer is not liable for any discriminatory practice then an individual employee cannot be held liable for aiding and abetting a discriminatory practice." <u>Scott v. Sunoco Logistics Partners, LP</u>, 918 F.Supp.2d 344, 357 n.5 (E.D. Pa. 2013)(citing <u>Unangst v. Dual Temp Co., Inc.</u>, No. 10-6811, 2012 WL 931130, *9 (E.D. Pa. Mar. 19, 2012)).  For the reasons discussed above, I have found that AutoZone is not liable for discriminatory practices under the PHRA.  Accordingly, it is clear that Defendant Davis, Defendant Broaddus and Defendant Greaves cannot be held individually liable under the PHRA for aiding and abetting discriminatory practices.  I will grant summary judgment for the individual defendants on the plaintiff's PHRA aiding and abetting claim.

     **B.**         <u>**Wrongful Discharge Claim**</u>

     Generally, Pennsylvania does not recognize a common law cause of action for wrongful discharge against an employer for termination of an at-will employee.  <u>Foley v. Presbyterian Ministers' Fund</u>, 749 F.Supp. 109, 111 (E.D. Pa. 1990).  Exceptions to this general rule are recognized only in two circumstances:  "(1) where the discharge violates clear mandates of public policy, (2) where the discharge is intended specifically to cause harm.  <u>Id.</u> (citations omitted).   Additionally, a wrongful discharge claim "may be maintained when there is no available statutory remedy for an aggrieved employee. <u>Hicks v. Arthur</u>, 843 F.Supp. 949, 957 (E.D. Pa. 1994)(citations omitted).  However, "if the legislature has enacted laws which precisely protect the interests of employees that the plaintiff alleges have been violated, then the plaintiff's cause of action cannot be maintained."  <u>Id.</u>

Mr. Arnold's amended complaint that the defendants are liable to him for wrongful discharge because the defendants "retaliated against Plaintiff and wrongfully discharged him for reporting illegal activity at work by the store management."  (Doc. No. 8, ¶ 82).  Mr. Arnold contends that the defendants violated public policy for terminating him in retaliation for reporting illegal conduct.  Mr. Arnold's claim is one that can be and has in fact been pursued by him under Title VII and the PHRA.  Under those statutes, I have found that Mr. Arnold is not entitled to relief.  Accordingly, I will grant summary judgment for the defendants on Mr. Arnold's wrongful discharge claim.

### C.       Defamation Claim

In order to demonstrate a successful claim for defamation under 42 Pa.C.S.A 8343, the plaintiff has the burden of proving: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion. 42 Pa.C.S.A § 8343(a).  A successful defense against defamation requires that the defendant show:  (1) the truth of the defamatory communication; (2) the privileged character of the occasion on which it was published; or (3) the character of the subject matter of defamatory comment as of public concern.  Id. at § 8343(b).  It is the responsibility of the court to determine whether the alleged statement is capable of defamatory meaning.  Tucker v. Phila. Daily News. 848 A.2d 113, 123-24 (2004).  In

order for the court to determine that the alleged statement is defamatory, a statement must "tend[] so to harm the reputation of another as to lower him in the estimation of the community or to deter third parties from associating or dealing with him." Ciolli v. Iravani, 651 F. Supp. 2d 356, 372 (E.D. Pa. 2009)(citing Maier v. Maretti, 671 A.2d 701, 704 (1995).  "It is not enough that the victim of the [statement] . . . be embarrassed or annoyed, he must have suffered the kind of harm which has grievously fractured his standing in the community of respectable society." Tucker, 848 A.2d at 124.  Actions for defamation have a one year statute of limitations.  42 Pa. Cons. Stat. Ann. § 5523(1).

### 1.    Mr. Arnold's Defamation Claim Against Defendant Davis

Mr. Arnold's defamation claim against Defendant Davis is based upon:  (1) statements that Defendant Davis made to other employees that Mr. Arnold did not agree with Ms. D.H. being hired; (2) Defendant Davis' March 8, 2012 written statement to AutoZone regarding the core exchange; and (3) Defendant Davis' false accusations to the hourly staff that Mr. Arnold was a thief, dishonest and untrustworthy.  (Doc. No. 65, Ex. E, 196:13-23; 197:1-22); (Doc. No. 8 ¶ 76).  Mr. Arnold's defamation claim against Defendant Broaddus is also based upon Defendant Broaddus' alleged accusations that Mr. Arnold was a thief, dishonest and untrustworthy.  (Doc. No. 65, Ex. E, 213:6-23).

It is clear that Mr. Arnold's defamation claim cannot stand on Defendant Davis' statements to other employees that Mr. Arnold did not agree with the hiring of Ms.

D.H..[19]  While Mr. Arnold claims that these statements, "were totally detrimental to any

type of respect [the employees] had for [him]," Mr. Arnold has not explained and I

cannot reasonably construe how these statements about the hiring of Ms. D.H. were

detrimental to the respect his employees had for him much less how they "grievously

fractured his standing in the community of respectable society." Tucker, 848 A.2d at 124;

Arnold Dep. 2  at 197:4-6.  While the comments might subject Mr. Arnold to

embarrassment, there is no defamatory meaning in these statements such that would

"blacken [Mr. Arnold's] reputation or [] expose him to public hatred, contempt, or

ridicule." Beckman v. Dunn, 419 A.2d 583, 586  (Pa. Super. 1980).  There simply is

nothing in these statements that rises to the level of defamation.

Mr. Arnold also brings a defamation claim against Defendant Davis for a written

statement that Defendant Davis made during Mr. Haley's investigation into the fraudulent

core exchange.  Defendant Davis' March 8th written statement reads:

> On 3/1/12 a customer came in to return an alternator core.
> Upon pulling up his warranty history Brandon noticed that he
> was not charged for a core.  I asked the customer who helped
> him and he said an older gentleman around his age.  I asked if
> the name Ed sounded correct and he said yes. After the
> customer left Brandon and I went to the core bin to verify the
> alternator was not in there and it was not.  I then pulled all of
> the alternators out and took pictures of all them with my
> camera phone.  The alternators all matched the PCI labels of
> aforementioned parts.  I then reported it to Cody and Doug
> Haley through Cody.

---

[19] Mr. Arnold states that his first defamation claim arises from the fact that Defendant Davis was "going to, you
know, going to other associates in the store stating that I didn't agree with her being hired."  (Doc. No. 65, Ex. E,
197:4-6).

(Doc. No. 67, Ex. FF).  Mr. Arnold contends: (1) that Defendant Davis' March 8th

statement "knowingly perpetuated the falsehood that Plaintiff caused a property and

financial loss to AutoZone;" (2) that Defendant Davis "acted knowingly and maliciously

to harm the plaintiff;" and (3) that "accusations of criminal activity or theft resulted in

Plaintiff's termination from a career with AutoZone." (Doc. No. 78[20], 14).  First, the

Defendants respond to Mr. Arnold's defamation allegations by claiming that the March

8th statement has no defamatory meaning.  Additionally, the Defendants contend that Mr.

Davis' March 8th statement was conditionally privileged as part of a legitimate loss

prevention investigation and Mr. Arnold has no evidence that the conditional privilege

was abused.

    I agree that the Plaintiff has failed to demonstrate that the March 8th statement

constitutes defamation.  Although the March 8th statement connects Mr. Arnold with this

particular core transaction, there is no accusation that Mr. Arnold participated in a theft or

fraud.  There is nothing in the language of the statement that would impute a lack of

integrity or dishonesty to Mr. Arnold.  Although the language of the statement is not

suggestive of defamation, the Plaintiff asks the Court to read into the situational context

of the statement to find that the statement "knowingly perpetuated the falsehood that

Plaintiff caused a property and financial loss to AutoZone."  However, other than the

Plaintiff's own theory that Defendant Davis concocted the fraudulent core exchange in

retaliation for Mr. Arnold reporting him for sexual harassment, the Plaintiff does not

provide any definitive evidence that Defendant Davis knew that Mr. Arnold had not made

---

[20] Plaintiff's Sur-Reply in Support of Opposition to Summary Judgment Filed by Defendant Donald Davis.

the improper core exchange and reported him anyway.  Neither the language on its face nor the situational context of the March 8th statement demonstrates a defamatory meaning.  Accordingly, I find that Defendant Davis is entitled to summary judgment on this basis alone.

Even assuming *arguendo* that the March 8th statement was defamatory in some manner, the Defendants would still be entitled to summary judgment because the March 8th statement was covered under a conditional privilege.  "Communications are privileged when made on a proper occasion, from a proper motive and in a proper manner."  Jones v. Johnson & Johnson, No. 94-7473, 1997 WL 549995, * 8 (E.D. Pa. Aug. 22, 1997)(Johnson v. Resources for Human Dev., Inc., 860 F.Supp. 218, 222 (E.D. Pa. 1994)).  "When circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know," a conditional privilege exists. Id. (citing Gaiardo v. Ethyl Corp., 697 F.Supp. 1377, 1383 (E.D. Pa. 1986)).  If the defendant succeeds in demonstrating that a communication is conditionally privileged, "the burden shifts to the plaintiff to establish that the defendant abused its conditional privilege."  Wilson v. American General Finance Inc., 807 F.Supp.2d 291, 299 (W.D. Pa. 2011)(citing Miketic v. Baron, 675 A.2d 324, 329 (Pa. Super. 1996)).

In this case, I agree with the Defendants that a conditional privilege applies to Defendant Davis' March 8th statement to Mr. Haley.  Both Defendant Davis, acting as a Store Manager for AutoZone, and Mr. Haley, acting as Regional Loss Prevention

Manager, share a common interest in protecting AutoZone property from theft and ensuring employees follow AutoZone policy in processing core exchanges. The March 8th statement was not disseminated publicly to employees without an interest in the investigation but rather, was confined only to those supervisors who were entitled to this information by reason of their job duties.

Moreover, the Plaintiff has failed to demonstrate that the Defendants abused the conditional privilege. See Beckman, 419 A.2d at 588 (A plaintiff can overcome the conditional privilege where "the publication is actuated by malice or negligence, . . ., is made for a purpose other than that for which the privilege is given, . . ., or to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege, . . . , or include defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose."). In an attempt to suggest malicious intention on the part of Defendant Davis, the Plaintiff argues that the March 8th statement "infers a missing core when in fact the core was returned at no loss to AutoZone," and that Defendant Davis "knowingly withheld the fact that the core had been return [sic],.." (Doc. No. 78, 13, 14). Despite the fact that the core was returned and AutoZone suffered no financial loss, Defendant Davis was still had a duty to report transactions which violated AutoZone policy. The fact that Defendant Davis reported the core exchange despite knowing that the core had already been returned does not suggest a malicious intention. The March 8th statement was a statement of fact regarding the core exchange at issue made to Mr. Haley, the Regional Loss Prevention Manager. Ultimately, even if the

Plaintiff could demonstrate that the March 8th statement was defamatory, the Plaintiff's defamation claim would still fail as the March 8th statement was covered under a conditional privilege.

Finally, Mr. Arnold argues that Defendant Davis published false accusations regarding the core exchange to hourly staff, but Mr. Arnold's claim is based only on Mr. McDonald's testimony that Ms. D.H. told him that Mr. Arnold was fired for "faking a core return." (Doc. No. 78, 13).  Even if the statement was published to Ms. D.H., Mr. Arnold has not demonstrated how this statement has harmed him.  Mr. Arnold's defamation claim cannot survive on these facts.  Therefore, I find that summary judgment is warranted on all of Mr. Arnold's defamation claims against Defendant Davis.

### 2.    Mr. Arnold's Defamation Claim Against Defendant Broaddus

Mr. Arnold also asserts a defamation claim against Defendant Broaddus alleging that on the date that Mr. Arnold was terminated, Defendant Broaddus "falsely accused the plaintiff of being a thief, dishonest and untrustworthy and discharged the plaintiff from employment."  (Doc. No. 8 ¶ 37).  Contrary to the allegations set forth in his amended complaint, Mr. Arnold reveals during his deposition that Mr. Broaddus did not make any statements to that effect.  Mr. Arnold testifies to the following:

> Q    And Mr. Broaddus read to you the reasons for your termination, correct, as listed on this Corrective Action Review Form?
>
> A    To be honest with you, he didn't read them to me.  He had the page upside-down.  I believe one of the managers came in; they said something; they left.  And then Mr. Broaddus said, "All right, there's something

we have to do or something we have to take care of."
He opened the page like that and said, "You're no
longer an employee of AutoZone," and such.

Q    Did he say anything else?

A    He said, "I need your badge, store keys," and I believe
that was it.

. . .

A    Yes. I asked him, "What was this." He said, "You're
no longer an employee of AutoZone," and I said,"
What do you mean I'm no longer an employee of
AutoZone." And he kept repeating himself, "You are
no longer an employee for AutoZone. It has come to
our decision that you no longer work here."

. . . .

A    He just kept repeating himself.

. . . .

Q    Did he say anything else to you during that termination
meeting?

A    No.

(Doc. No. 61, Ex. A, 151: 5-24; 152:1-24; 153:1-2).  It is apparent from the plaintiff's

own testimony that Defendant Broaddus did not "falsely accuse[] the plaintiff of being a

thief, dishonest and untrustworthy. . . ."  (Doc. No. 8 ¶ 37).  Moreover, Mr. Arnold

cannot claim that the defamatory statements arose from the CAR form that Defendant

Broaddus gave to Mr. Arnold during the termination meeting.  The CAR form is devoid

of any accusations that Mr. Arnold is a "thief, dishonest or untrustworthy."  (Doc. No. 61,

Ex. A, P-6).  The only reason for termination that Mr. Broaddus wrote on the CAR form

was, "[i]mproper cash register procedures, conduct detrimental to Autozone, Autozoners

and Autozone customers, loss of confidence."  Id.  Mr. Arnold provides no other

evidence to indicate that Mr. Broaddus made any defamatory statements about Mr. Arnold on the date of his termination.  Accordingly, I find that the AutoZone Defendants are entitled summary judgment on Mr. Arnold's defamation claim.

## IV.    CONCLUSION

For the reasons discussed above, I will grant the AutoZone defendants' motion for summary judgment and I will grant defendant Donald Davis' motion for summary judgment.

An appropriate Order follows.